JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiff sues for excess costs which were incurred in connection with the performance of an experimental contract. The facts in detail are set out in the findings.
The plaintiff initiated the preliminary discussions and later, on December 10, 1942, submitted to the Navy Department a “prospectus,” which contained the following:
We have succeeded in incorporating the following features in our automatic mixture control, some of which are not yet found in present carburetors and fuel injection mixture controls.
A number of features were set forth in the prospectus, the important ones being built around what is known as the speed-density principle.
The stated purpose was to effect revolutionary improvements in the carburetion of airplane engines when flown at high altitudes where the performance of the type of carburetors then in use was adversely affected by the reduced *6 atmospheric density. The correction of this difficulty was of importance to the Navy, especially during the war when a great deal of high-altitude flying was necessary.
Relying upon the representations of plaintiff in which it proposed to manufacture an automatic mixture control device which incorporated certain features not then found in carburetors, and fuel injection controls, the defendant issued a letter of intent, dated January 13, 1943, on the basis of which it undertook to manufacture three fuel metering devices subject to rigorous performance specifications.
The letter signified the intention of the Navy Department to enter into a formal contract for the manufacture of such devices. It was provided that the letter of intent should terminate if a formal contract was not executed by March 30, 1943, unless the time was extended. The letter fixed no price, but stipulated that plaintiff, at the earliest possible date, would submit a firm quotation supported by a cost breakdown.
Due to extensions granted plaintiff, during which time it reported progress, the formal contract was not entered into until September 4, 1943. The pertinent details of the contract are set out in finding 3. The fixed price was $73,787.68, subject to upward or downward revision, pursuant to the terms of the contract. According to approved designs plaintiffs constructed initial models of the devices.
Before the first device was submitted plaintiff wrote the Navy Department that it was running into unforeseen difficulties due to lack of finances, late deliveries by subcontractors and interferences, and asked for an increased price of $10,000 to “partially compensate * * * for our great increase in cost.” The Bureau of Aeronautics, Navy Department, agreed to an amendment to the contract, making certain changes, but did not agree to increase the over-all price. This amendment was accepted by plaintiff on June 15,1944.
Plaintiff, on March 23, 1945, asked for an increase to $176,640.50, the asserted reasons being set out in finding 12.
The Navy Department declined to agree to the increase in price.
Between May 14, 1944, and January 10, 1946, when the contract was terminated for the convenience of the Govern *7 ment, the plaintiff submitted six successive models of tbe control unit and five of the fuel pump. The basic design and the shape of the models were not changed and the original castings were used throughout the contract period.
None of the units and none of the pumps were satisfactory and none of them met the requirements of the specifications, although plaintiff worked for several months on one of the units completely redesigning it.
Defendant did not order any of the changes nor any redesigning. Plaintiff neither asked for nor received permission from the defendant to make the changes.
Pertinent parts of sections 8 and 4 of the contract are as follows:
Section 8. Guarantees. — (a) The contractor guarantees that the articles provided under this contract will conform to the specifications herein, and will be free from any defects in material and workmanship.
Section 4. Inspection. — (a) * * * In case any articles fail to comply with the requirements of the Section hereof entitled “Guarantees,” the Government shall have the right to reject such articles, or require their correction or replacement. * * *
Repeated reworking of models, defective materials, faulty manufacturing procedure and lack of finances contributed to plaintiff’s costs.
After the termination of the contract on January 10,1946, plaintiff requested a retroactive price increase from $73,-787.68 to $218,803.36 to cover excess costs over its estimates, and also submitted a termination settlement proposal in the sum of $194,207.47.
The reasons for the adverse decisions on these applications are set out in findings 18 and 19. No appeal was taken from these decisions.
Plaintiff was paid the original contract price of $73,787.68, plus settlement expenses and interest.
Plaintiff incurred costs in excess of the contract revenue in the sum of $106,164.17, a large part of which was attributable to plaintiff’s own mistakes, and no part of which was due to any act or fault of defendant in violation of any of the terms and conditions of the contract.
*8 Plaintiff initiated and voluntarily executed an experimental contract, and while it undoubtedly expended more than it had anticipated and a greater amount than it received, we think none of it is chargeable to the Government under the terms of the contract and specifications. Steel Products Co. v. United States, 78 C. Cls. 410; Hervey Veneer Co. v. United States, 110 C. Cls. 88.
Plaintiff is not entitled to recover under the terms of the contract.
Defendant has filed a counterclaim. No substantial evidence was offered in its support. It was probably offered as a precautionary step, a sort of safeguard in the event some wayfarer in rambling through the record — the plaintiff having submitted no brief — might find some basis for allowing plaintiff to recover, in which event the defendant would need protection in the way of an offset. Otherwise, according to the statement of the Eeconstruction Finance Corporation, out of whose transactions the counterclaim arose, a deficiency judgment would be useless. Perhaps this precaution on the part of defendant’s counsel was wise since no mind can tell for certain what another mind may conclude. In the light of the entire record we think plaintiff has been treated fairly.
The petition of the plaintiff and the counterclaim of the defendant are dismissed.
It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, as follows:
1. Bristol and Martin, Inc., is a corporation organized under the laws of New York, having its principal place of business at 466 Broome Street, New York 13, New York.
2. Mr. D. J. Deschamps, an employee of plaintiff in charge of its Fuel Injection Department, after having previously *9 initiated discussions with the Department of the Navy, submitted on December 10, 1942 a “prospectus” to defendant, which stated in part:
We have succeeded in incorporating the following features in our automatic mixture control, some of which are not yet found in present carburetors and fuel injection mixture controls.
Then followed a list of ten technical features, which need not be set forth in detail. It is sufficient to say that the most important feature of the device was that it was based upon a certain principle known as the speed-density principle.
There has always been some doubt as to the feasibility of speed-density carburetion, and plaintiff’s proposed device was experimental.
3. Defendant, relying upon the representations made by plaintiff in its “prospectus”, on January 13,1943, sent a letter of intent to plaintiff whereby plaintiff undertook to perform certain work described therein as follows:

Item 1

Design, develop and construct three (3) fuel metering devices suitable for use on model B-2800 engines requiring down-draft carburetion. Each device shall be comprised of the following:
tal A throttle body with mixture control attached,
(b) A positive displacement fuel injection pump, and
(c) A vapor eliminator.
4. The purpose of this work was to effect revolutionary improvements in the carburetion of airplane engines at high altitudes by utilizing the principles of fuel injection. Due to conditions of atmospheric density at high altitudes, the performance of the type of carburetor then in use was unreliable or defective; so that the perfection of this new principle was of great importance in the prosecution of the war, and also from the Navy’s long-range point of view of progress in high altitude flying. At the times mentioned in this petition, the experimental work undertaken by the plaintiff was entirely of a pioneer character, the plaintiff, at the initiation of the project, being the sole manufacturer engaged therein in this country. The performance specifications imposed by the contract were very rigorous.
*10 5. The letter of intent signified the intention of the Navy Department to enter into a formal contract for the manufacture by plaintiff of the above devices. It provided that the letter of intent should terminate if the formal contract were not executed by the end of the second full calendar month after date (i. e., by March 30, 1943), unless the time were extended. The letter of intent fixed no price, but provided that plaintiff would submit at the earliest possible date a firm quotation supported by a cost breakdown.
6. On March 9, 1943, plaintiff wrote the Navy, Bureau of Aeronautics, asking for an extension of the time allowed for execution of the formal contract. Plaintiff stated that it was “making good progress with the project”, but that it had not yet been able to obtain cost data of certain items and therefore asked the Navy to agree to extend the letter of intent for two months, within which plaintiff felt it could submit the definite cost figures upon which to base a formal contract. Because of extensions of time granted in response to this and subsequent requests by plaintiff, the formal contract was not entered into until September 4,1943. The reason for the extension of time between the issuance of the letter of intent and the execution of the contract was to allow plaintiff time to make cost estimates so as to be able to submit a firm cost proposal for incorporation in the contract.
7. By formal contract No. NOa(s) 156, plaintiff undertook to perform the work described therein, for a fixed price of $73,787.68, which price, however, was subject to upward or downward revision in accordance with the terms of the contract. The fixed price, submitted by plaintiff, was based upon plaintiff’s estimate of the cost of the design and shop work. Plaintiff believed that it could manufacture the devices called for in the contract in accordance with the very rigorous specifications.
The pertinent provisions of the contract are:
SECTION 4-INSPECTION
* * * In case any articles fail to comply with the requirements of the Section hereof entitled “Guarantees”, the Government shall have the right to reject such articles, or require their correction or replacement. # * *
*11 SECTION- 12 — CHANGES
(a) The specifications, drawings and designs may be changed at any time by agreement in writing between the contractor and the contracting officer or by order of the contracting officer, as hereinafter provided. Each desired change shall be requested in writing by the party desiring it: * * *
(b) * * * appropriate changes in the contract price and other relevant provisions shall be determined by mutual agreement between the contractor and the contracting officer and such changes shall be set forth in an amendment to the contract.
SECTION IS — TERMINATION
«J* H» »Í» 5Í» *f»
(b) This contract may be terminated by the contracting officer as a whole or in part by written notice whenever he shall determine that termination is for the best interest of the Government. * * *
SECTION 21 — DISPUTES
Except as otherwise specifically provided in this contract, all questions concerning questions of fact arising under this contract shall be decided by the contracting officer, subject to written appeal by the contractor within thirty (30) days to the Secretary of the Navy or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance.
8. Defendant’s Bureau of Aeronautics approved designs and drawings which the plaintiff submitted to it pursuant to the contract, and on the basis of which plaintiff constructed its initial models of these devices.
9. Plaintiff had underestimated the cost of performing the contract, and before the first device was submitted to defendant for testing, plaintiff, on March 15, 1944, wrote a letter addressed to the Chief of the Bureau of Aeronautics, Navy Department, stating that it had “run into many unforeseen difficulties due to lack of finances, late deliveries of subcontractors and interference with our own production on these units”, and therefore asked that the amount of the contract be increased by $10,000 to “partially compensate us for our very great increases in cost.”
*12 10. On May 30,1944, the Bureau submitted to plaintiff an amendment-to the contract which made certain changes in the contract. However, it was specifically stated that “this amendment does not affect the total contract price.” The amendment was accepted by plaintiff on June 15,1944.
11. On March 23, 1945, plaintiff again wrote to the Chief of the Bureau of Aeronautics, this time asking for an increase in the contract price from $73,787.68 to $176,640.50, to take care of increased costs. In relating the reasons for requesting this price increase, plaintiff stated:
The increased costs we incurred in the development of this equipment over and above our originally estimated costs were not due to any lack of engineering ingenuity, faulty planning or want of diligence on our part, but to: (á) unforeseeable and unavoidable difficulties and delays beyond our control; (b) extension of the scope of experimentation to lengths we did not anticipate; (c) failure to obtain financial assistance at critical points; and (d) the high degree of perfection required by the Navy.
The Navy declined to grant any price increase.
12. The contract was terminated for the convenience of the Government on January 10,1946.
13. During the period from May 14, 1944, to January 10, 1946, plaintiff had submitted six successive models of the mixture control unit and five successive models of the fuel pump to defendant for testing.
The basic design of the device was not changed on any of the models submitted for testing. The shape of the devices was not changed, and the original castings that plaintiff had used for the test model were used by plaintiff throughout the contract period.
14. The original model submitted by plaintiff did not work because the designs submitted by plaintiff were not proper and did not comply with the specifications.
Plaintiff’s tests showed that the first mixture control unit did not work, but nevertheless plaintiff sent it to defendant for testing. Before defendant’s report of the tests which showed the unit did not work, was received by plaintiff, plaintiff’s engineers, on their own initiative, redesigned the unit.
*13 The second mixture control unit which was submitted did not work because it was “unstable”, even though plaintiff had completely redesigned it upon a different principle of operation, and had spent six months working on it.
The third mixture control unit submitted did not work, and the fourth unit was also unsatisfactory. Altogether, plaintiff submitted six successive models of the mixture control unit, of which none ever complied with the specifications.
The tests on the first fuel metering pump were terminated because the plungers stuck. Plaintiff thereafter attempted to simplify the pump by designing a completely new pump. This redesigned pump was never submitted to defendant for testing.
Tests on the second model submitted for testing were terminated because the plungers stuck. Although plaintiff made numerous changes in the five successive models of the pumps submitted to defendant for testing, none of the models submitted ever complied with the specifications.
15. Defendant did not order plaintiff to make the changes or to redesign the devices. Plaintiff made the changes of its own accord in an attempt to prove that the design would function. Plaintiff neither asked for nor received written permission from defendant to make the changes.
16. The repeated reworking of the models, in the attempt to achieve the specificed performance, materially increased costs over plaintiff’s estimates.
Defective materials, faulty manufacturing procedure, late deliveries by subcontractors, and the lack of finances also contributed to plaintiff’s increased costs.
Plaintiff’s losses were also increased by manufacturing many devices which it never submitted to defendant for testing.
17. After the termination, plaintiff submitted two applications to defendant. One was a request for a retroactive price increase from $73,787.68 to $218,803.36 to cover the excess of its costs over its estimates; the other was a termination settlement proposal in the amount of $194,207.47.
18. The application for retroactive price increase was denied by the contracting officer on August 9, 1946, on the ground that an amendment to the contract increasing the *14 contract price would be without consideration; the granting of such relief could not be deemed actually to facilitate the prosecution of the war, and any need for price adjustment resulted from a mistake or error (if any was made at all) on the pai't of the contractor alone; and that a price increase was therefore not permissible under the First War Powers Act of 1941, as implemented by Executive Order 9001 and the Secretary of Navy’s directive of 7 July 1943. Plaintiff made no written appeal to the Secretary of the Navy from this decision of the contracting officer.
19. Plaintiff’s contract settlement proposal was rejected on the ground that under the joint termination regulations of the Contract Settlement Act of 1944, the maximum amount payable on termination of the contract was the contract price, which was $73,787.88, unless and until amended. Plaintiff was allowed said price plus settlement expenses and interest.
20. These decisions were reaffirmed at conferences between officers of the plaintiff and representatives of the Bureau of Aeronautics on July 25,1946, and other dates, and in correspondence between the parties at about the same time. Plaintiff took an appeal to the Appeal Board, Office of Contract Settlement, which was denied.
21. Plaintiff incurred costs in excess of contract revenue of $106,164.17, but the evidence shows that a large part of such excess costs was attributable to plaintiff’s own mistakes and fault, and that no part thereof was attributable to any act or fault of defendant in violation of any of the terms and conditions of the contract.
defendant’s counterclaim;
22. No evidence on the counterclaim has been taken or filed.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.
The court further concludes that as a matter of law the defendant is not entitled to recover on its counterclaim and it is therefore dismissed. [Without prejudice.] *
*15 Judgment is rendered against plaintiff for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.

 Amended June 2, 1953.